## IN RE MICHAEL J. DODSON
### (13622)

PETERS, C. J., HEALEY, SHEA, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued December 5, 1989—decision released March 27, 1990

*Brian M. O'Connell,* for the appellant (petitioner).

*Timothy J. Sugrue,* deputy assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The petitioner Michael J. Dodson has brought a writ of error to this court seeking a reversal of the Superior Court judgment finding him in contempt of court and imposing a fine of $100. The writ raises the issue of whether the petitioner's adjudication and punishment of summary criminal contempt comported with due process under the fourteenth

amendment to the United States constitution,[1] article first, § 8, of the Connecticut constitution[2] and §§ 985 and 988 of the Practice Book.[3]

"The present case, which involves a review of a summary criminal contempt proceeding, comes before us on a writ of error which is the sole method of review of such proceedings. *Whiteside* v. *State,* 148 Conn. 77, 78–79, 167 A.2d 450 (1961); *Goodhart* v. *State,* 84 Conn. 60, 63, 78 A. 853 (1911). The scope of our review reaches only those matters appearing as of record. *State* v. *Assuntino,* 180 Conn. 345, 347, 429 A.2d 900 (1980); *Reilly* v. *State,* 119 Conn. 217, 223, 175 A. 582 (1934). In a review of summary criminal contempt, the inquiry is limited to a determination of the jurisdiction of the court below. *Tyler* v. *Hammersley,* 44 Conn. 393, 413 (1877). Subsumed in this inquiry are three questions, namely, (1) whether the designated conduct is legally susceptible of constituting a contempt; *Goodhart* v. *State,* supra; (2) whether the punishment imposed was authorized by law; *State* v. *Jackson,* 147 Conn. 167, 169, 158 A.2d 166 (1960); and (3) whether the judicial authority was qualified to conduct the hearing. *Mayberry* v. *Pennsylvania,* 400 U.S. 455, 465–66, 91 S. Ct. 499, 27

[1] The fourteenth amendment to the United States constitution provides in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . . "

[2] The constitution of Connecticut, article first, § 8, provides in part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . . "

[3] Practice Book § 985 provides: "A criminal contempt is conduct that is directed against the dignity and authority of the court. The sanction for a criminal contempt is punitive in order to vindicate the authority of the court."

Practice Book § 988, entitled "Nature of Proceedings" (summary contempt), provides: "A criminal contempt may be punished summarily if the conduct constituting the contempt was committed in the actual presence of the court or the judicial authority and such punishment is necessary to maintain order in the courtroom. A judgment of guilty of contempt shall include a recital of those facts on which the adjudication of guilt is based. Prior to the adjudication of guilt the judicial authority shall inform the

L. Ed. 2d 532 (1971)." *Moore* v. *State,* 186 Conn. 256, 257, 440 A.2d 969 (1982).

The record discloses, inter alia, the following. On November 10, 1988, the petitioner, an attorney admitted to the practice of law in Connecticut, was representing Michael Walker[4] at a sentencing hearing before Judge James Higgins in the Superior Court. During the course of that hearing, and immediately following the imposition of sentence, the following took place between the court and the petitioner:

"Mr. Dodson: I think it is most unusual. I think that is totally outrageous. The court can do—

"The Court: You may notify the defendant—

"Mr. Dodson: Thirty years more on the same set of facts, I think . . .

"The Court: Notify the defendant of his rights to appeal.

"Mr. Dodson: There is no basis—

"The Court: You're out of order.

"Mr. Dodson: I know I am, but there is no basis for that sentence.

"The Court: He is held in contempt of this court.

defendant of the accusation against him and inquire as to whether he has any cause to show why he should not be adjudged guilty of contempt by presenting evidence of excusing or mitigating circumstances."

[4] On September 22, 1988, after a jury trial, Michael Walker had been found guilty of one count of murder in violation of General Statutes §§ 53a-8 and 53a-54a (a), one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a) and one count of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-8. The first count involved the death of Thomas Dixon; the second count involved Tracey Fisher as a coconspirator; and the third count involved the injury of Barrington Solomon. The trial court, *Higgins, J.,* imposed a sentence of sixty years on the first count, and sentences of twenty years on each of the second and third counts to be served concurrently but to be served consecutively to the sentence imposed on the first count. Thus, the total effective sentence was eighty years. The petitioner also represented Walker during his trial.

"Mr. Dodson: I apologize for my remarks.

"The Court: Notify the defendant of his rights to appeal on the record."

The court thereupon took a recess. The petitioner was asked to remain in the courtroom and was allowed access to a telephone to obtain counsel. Shortly thereafter, Attorney Gerald Klein arrived at Judge Higgins' chambers to indicate that he represented the petitioner. At that time, Klein was shown a copy of the transcript of the prior proceedings that had already been prepared. The court was prepared to continue and finish the summary contempt proceedings at that time. A request for a continuance, made by Klein, was granted to Tuesday, November 15, 1988. (November 11, 1988, a Friday, was a holiday and there was no court on November 14, 1988, the following Monday, due to the Connecticut State Bar Association meeting.)

On Tuesday, November 15, 1988, the court held a hearing at which the petitioner appeared with Klein. After the court inquired whether the petitioner wished to be heard, both Klein and the petitioner addressed the court. At the conclusion of the hearing, the court imposed a fine of $100. This writ of error by the petitioner followed.

The petitioner maintains that his conduct in open court on November 10, 1988, did not constitute a contempt within the meaning of Practice Book § 985. This rule states that "criminal contempt is conduct that is directed against the dignity and authority of the court." See *State* v. *Jackson,* supra. In denying the applicability of § 985, the petitioner points to Practice Book § 986[5] which provides who may be punished for crimi-

---

[5] Practice Book § 986, entitled "Who May Be Punished [for Criminal Contempt]," provides: "The judicial authority may punish by fine or imprisonment or both:

nal contempt. He contends that his conduct does not place him within any portion of § 986, which, he says, must involve not only an act that "disturbs" the dignity and authority of the court, but must also be directed against it. His conduct, he asserts, does not reflect an intent to disobey the rules or orders of the court but rather "the record clearly depicts [him] in the role of an advocate, engaged in the representation of a client." His "statement" did not, he maintains, "interrupt the Court in its pronouncement of sentence, but rather occurred after the court had recited all penalties and imposed costs." Moreover, the petitioner claims that "his forbearance clearly belies any claim that his intention was to disrupt the proceedings at hand." In addition, he claims that it cannot be "alleged" that he violated any procedural rule restricting an attorney's opportunity to address the court subsequent to the imposition of sentence. In a word, his conduct, from his perspective, was confined to his legal responsibility of providing effective representation. We hold nonetheless that the petitioner's conduct constituted a contempt under § 985.

I

Since we speak of criminal contempt as conduct against the dignity and authority of the court, it is useful briefly to articulate the concepts of dignity and authority encompassed in this context. The expression "dignity of the court" proclaims a demand, to all deal-

---

"(1) Any person who in the court's presence behaves in a contemptuous or disorderly manner;

"(2) Any person who violates the dignity and authority of any court, or any judicial authority, in its presence or so near thereto as to obstruct the administration of justice;

"(3) Any officer of the court who misbehaves in the conduct of his official court duties; or

"(4) Any person disobeying in the course of a civil or criminal proceeding any order of a judicial authority."

ing with the court, for proper respect and obedience in its function of interpreting, administering and enforcing the law within its authority to do so. See generally *Brannon* v. *State,* 202 Miss. 571, 582, 29 So. 2d 916 (1947). "Authority" can be and has been said to mean the "[r]ight to exercise powers; to implement and enforce laws; to exact obedience; to command; to judge. . . . [It is] [o]ften synonymous with power." Black's Law Dictionary (5th Ed.) In a free society, the courtroom "is a forum for the courteous and reasoned pursuit of truth and justice." *Taylor* v. *Hayes,* 418 U.S. 488, 503, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974). These concepts meaningfully embody that view of dignity and authority that should attend the proper, independent and fair discharge by the court of its duties under the rule of law. That view is hardly to be implemented platitudinally here, but in the warp and the woof of due process of law.

It is also useful to note at this point that where summary contempt is involved, the United States Supreme Court has indicated that it is wary of the power and cognizant of its potential for abuse. It, therefore, became established early in American jurisprudence that contempt limits a court in such cases to "the least possible power adequate to the end proposed." *Anderson* v. *Dunn,* 19 U.S. (6 Wheat.) 204, 231, 5 L. Ed. 242 (1821),[6] quoted, inter alia, in *In re Michael,* 326 U.S. 224, 227, 66 S. Ct. 78, 90 L. Ed. 30 (1945); *In re Oliver,* 333 U.S. 257, 274, 68 S. Ct. 499, 92 L. Ed. 682 (1948); *Harris* v. *United States,* 382 U.S. 162, 165, 86 S. Ct. 352, 15 L. Ed. 2d 240 (1965); *Shillitani* v. *United States,* 384 U.S. 364, 371, 86 S. Ct. 1531, 16 L. Ed.

---

[6] In *Anderson* v. *Dunn,* 19 U.S. (6 Wheat.) 204, 227, 5 L. Ed. 242 (1821), the court also said that courts "by their very creation [are vested] with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates . . . ." See also *Young* v. *United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 798, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987).

2d 622 (1966). The purposes, nevertheless, of a criminal contempt order are to punish willful disregard of the authority of the court and to deter the occurrence of similar derelictions. *United States* v. *United Mine Workers,* 330 U.S. 258, 302–303, 67 S. Ct. 677, 91 L. Ed. 884 (1947); *In re Irving,* 600 F.2d 1027, 1037 (2d Cir. 1979), cert. denied, 444 U.S. 866, 100 S. Ct. 137, 62 L. Ed. 2d 89 (1979). Only recently, the United States Supreme Court has observed that "[t]he underlying concern that gave rise to the contempt power was not, however, merely the disruption of court proceedings. Rather, it was disobedience to the orders of the judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Young* v. *United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 798, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987).[7]

There can be little doubt that an attorney may be, and should be, zealous in his representation of a client and "[f]ull enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts." *Sacher* v. *United States,* 343 U.S. 1, 9, 72 S. Ct. 451, 96 L. Ed. 717 (1952); see *People* v. *DeJesus,* 42 N.Y.2d 519, 369 N.E.2d 752, 399 N.Y.S.2d 196 (1977). "The arguments

---

[7] In *Young* v. *United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 795, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), the court also noted " '[t]hat the power to punish for contempt is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice.' " See also *Gompers* v. *Bucks Stove & Range Co.,* 221 U.S. 418, 450, 31 S. Ct. 942, 55 L. Ed. 797 (1911).

The American Bar Association Standards for Criminal Justice (2d Ed. Sup. 1982), Special Functions of the Trial Judge, Standard 6-4.1, entitled "Inherent power of the court," provides: "The court has the inherent power to punish any contempt in order to protect the rights of the defendant and the interests of the public by assuring that the administration of criminal justice shall not be thwarted. The trial judge has the power to cite and, if necessary, punish summarily anyone who, in the judge's presence in open court, willfully obstructs the course of criminal proceedings."

of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty." *In re McConnell,* 370 U.S. 230, 236, 82 S. Ct. 1288, 8 L. Ed. 2d 434 (1962); *In re Meizlish,* 72 Mich. App. 732, 736, 250 N.W.2d 525 (1977). The attorney's right to be zealous, vigorous, persistent and complete in the representation of a client is not, however, unlimited. That representation must be within the bounds of the law. "[A]n attorney as an officer of the court should be held to a higher standard of courtroom conduct than a layman." *Commonwealth* v. *Stevenson,* 482 Pa. 76, 90, 393 A.2d 386 (1978). As an officer of the court, he must "preserve and promote the efficient operation of our system of justice." *Chapman* v. *Pacific Telephone & Telegraph Co.,* 613 F.2d 193, 197 (9th Cir. 1979); see *Maness* v. *Meyers,* 419 U.S. 449, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975); *Cologne* v. *Westfarms Associates,* 197 Conn. 141, 148, 496 A.2d 476 (1985).

On the matter of "courtroom decorum," an attorney "[a]s an officer of the court . . . should support the authority of the court and the dignity of the trial court by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, opposing counsel, witnesses, jurors, and others in the courtroom." American Bar Association Standards for Criminal Justice (2d Ed. Sup. 1982), The Defense Function, Standard 4-7.1. The Code of Professional Conduct provides, inter alia, that a "lawyer shall not . . . (c) [e]ngage in conduct intended to disrupt a tribunal." Code of Professional Conduct Rule 3.5 (c). It also provides that "[i]t is professional misconduct for a lawyer to . . . (d) engage in conduct that is prejudicial to the administration of justice." Code of Professional Conduct Rule 8.4 (d). It is appropriate to consider

and apply ethical benchmarks, as well as case law, when determining whether an attorney's conduct is inappropriate to his role and thus constitutes contumacious behavior—all within the rule of law.

As to the court, " '[t]he role of the Trial Judge is neither that of automaton nor advocate' . . . nor is a judge merely an 'umpire in a forensic encounter' but '[h]e is a minister of justice' and in 'whatever he does . . . the trial judge should be cautious and circumspect in his language and conduct.' " *State* v. *Fernandez*, 198 Conn. 1, 10, 501 A.2d 1195 (1985); *State* v. *Woolcock*, 201 Conn. 605, 622, 518 A.2d 1377 (1986). " 'A judge . . . should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.' . . . The trial judge should be the exemplar of dignity and impartiality." *Swenson* v. *Dittner*, 183 Conn. 289, 297, 439 A.2d 334 (1981); *State* v. *Echols*, 170 Conn. 11, 13–14, 364 A.2d 225 (1975). The trial judge has the obligation to use his or her power to prevent distractions from and disruptions of the trial. Where the judge decides to impose sanctions for misconduct, "ordinarily [the judge should] impose the least severe sanction appropriate to correct the abuse and to deter repetition . . . . " American Bar Association Standards for Criminal Justice (2d Ed. Sup. 1982), Special Functions of the Trial Judge, Standard 6-3.3;[8] see *Commonwealth* v. *Garrison*, 478 Pa.

---

[8] The American Bar Association Standards for Criminal Justice (2d Ed. Sup. 1982), Special Functions of the Trial Judge, Standard 6-3.3, entitled "Judge's use of powers to maintain order," provides: "The trial judge has the obligation to use his or her judicial power to prevent distractions from and disruptions of the trial. If the judge determines to impose sanctions for misconduct affecting the trial, the judge should ordinarily impose the least severe sanction appropriate to correct the abuse and to deter repetition. In weighing the severity of a possible sanction for disruptive courtroom conduct to be applied during the trial, the judge should consider the risk of further disruption, delay, or prejudice that might result from the character of the sanction or the time of its imposition."

356, 366, 386 A.2d 971 (1978); *Burgess* v. *Towne*, 13 Wash. App. 954, 960, 538 P.2d 559 (1975).

In addition, it is proper to note that "[t]he law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate." *Craig* v. *Harney*, 331 U.S. 367, 376, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947). They must be on guard against confusing offenses to their sensitivities with the obstruction of justice. *In re Little*, 404 U.S. 553, 555, 92 S. Ct. 659, 30 L. Ed. 2d 706 (1972). Indeed, "[a] court of law is not the personal fiefdom of the individual who happens to be sitting at the bench." *Edmunds* v. *Chang*, 365 F. Sup. 941, 948 (D. Haw. 1973), rev'd on other grounds, 509 F.2d 39 (9th Cir.), cert. denied, 423 U.S. 825, 96 S. Ct. 39, 46 L. Ed. 2d 41 (1975). The trial judge, nevertheless, has the duty to deter and correct misconduct of attorneys with respect to their obligations as officers of the court to support the authority of the court and enable the trial to proceed with dignity. American Bar Association Standards of Criminal Justice (2d Ed. Sup. 1982), Special Functions of the Trial Judge, Standard 6-3.5.[9] In

---

[9] The American Bar Association Standards for Criminal Justice (2d Ed. Sup. 1982), Special Functions of the Trial Judge, Standard 6-3.5, entitled "Deterring and correcting misconduct of attorneys," provides: "The trial judge should require attorneys to respect their obligations as officers of the court to support the authority of the court and enable the trial to proceed with dignity. When an attorney causes a significant disruption in a criminal proceeding, the trial judge, having particular regard to the provisions of standard 6-3.3, should correct the abuse, and if necessary, discipline the attorney by use of one or more of the following sanctions:

"(a) censure or reprimand;

"(b) citation or punishment for contempt;

"(c) removal from the courtroom;

"(d) suspension for a limited time of the right to practice in the court where the misconduct occurred if such sanction is permitted by law; and

"(e) informing the appropriate disciplinary bodies in every jurisdiction where the attorney is admitted to practice of the nature of the attorney's misconduct and of any sanction imposed."

*Sacher* v. *United States,* supra, 13, while recognizing
the duty of the trial judge to protect fully an attorney's
right to represent his client vigorously, the court also
acknowledged the duality of the role of an attorney,
as an officer of the court as well as an advocate. In deal-
ing with circumstances involving a potential contempt
of an attorney, trial judges should remain aware that
an attorney is a vital component of our legal system
unlike that of a criminal defendant or a party to a civil
action.

The remarks of the trial court and the petitioner, as
well as the action of the court on November 10, 1988,
have already been referred to. To these must be added
that during the petitioner's "outburst" the trial court
later said that the petitioner's voice was "elevated" and
that he "threw" his pencil on the counsel table.[10] This

---

[10] At the November 15, 1988 hearing, counsel for the petitioner charac-
terized his client's conduct on November 10, 1988, as an "outburst." He
also noted that he had read the transcript of November 10, 1988, and that
he understood "from speaking to other people who were here that the way
[the petitioner] expressed himself was worse than what you see in black
and white." The general rule is that the admissions of an attorney are
imputed to his client. *Lafayette Bank & Trust Co.* v. *Aetna Casualty & Surety
Co.,* 177 Conn. 137, 140, 411 A.2d 937 (1979); see 7 Am. Jur. 2d, Attor-
neys at Law § 136.

We note that it was not until November 28, 1988, at least thirteen days
after the trial court imposed the fine upon the petitioner, that he filed a
motion for articulation in which he asked for a written articulation "of the
nature of the legal basis for the sanctions placed upon him for conduct which
transpired on November 10, 1988." That motion also "specifically"
requested "that the court apprise him as to whether its action was civil
or criminal contempt and whether if of a criminal nature, the action was
taken under Connecticut Practice Book Section 988. Alternatively, if no
contempt was found, [petitioner requested] whether the aforementioned
action was taken under Connecticut General Statutes Section 51-84."

The trial judge's articulation stated that the "proceedings were Summary
Criminal Contempt under P.B. § 988." It also said that "[t]he contempt
was self-evident. The court imposed a fine of $100 in punishment of said
contempt to uphold the dignity of the court. *State* v. *Jackson,* 147 Conn.
167, 169 [158 A.2d 166] (1960)."

conduct can technically be said not to have taken place during the "trial." A criminal "trial" may be said to be those proceedings to determine the guilt or innocence of an accused and ordinarily ends with the verdict or other decision of the trier of fact. See *People* v. *Smith,* 4 Cal. App. 3d 403, 410, 84 Cal. Rptr. 412 (1970); *State* v. *Drake,* 259 N.W.2d 862, 868 (Iowa 1977); *State* v. *Johnson,* 363 So. 2d 458, 461 (La. 1978); Black's Law Dictionary (5th Ed.); cf. *People* v. *Betillo,* 53 Misc. 2d 540, 279 N.Y.S.2d 444 (1967). The petitioner's conduct took place immediately after sentencing. A sentence is the judgment of the court formally pronounced which "award[s] the punishment to be inflicted." *Belden* v. *Hugo,* 88 Conn. 500, 501, 91 A. 369 (1914). The petitioner's conduct took place while the sentencing court was "in session" when the court was actively presiding while engaged in processing the business of the Superior Court.

It is against this background and the legal and ethical benchmarks that we must now determine whether the petitioner's conduct in open court on November 10, 1988, was contumacious because it went beyond the permissible parameters of advocacy and, thus, a contempt of court. We answer this in the affirmative.

The petitioner's conduct took place in open court with the trial judge on the bench. It took place several weeks after a jury had found the petitioner's client, Walker, guilty; the trial was over. It took place as the trial judge was attempting to instruct the clerk to give Walker notice of his rights to appeal, as provided for by Practice Book § 945.[11] The court attempted to accomplish

[11] Practice Book § 945, entitled "Notification of Right to Appeal," provides: "Where there has been a conviction after a trial, or where there has been an adverse decision upon an application for a writ of habeas corpus brought by or on behalf of one who has been convicted of a crime, it shall be the duty of the clerk of the court, immediately after the pronouncement of the sentence or the notice of a decision on the application for a writ of

this twice and was interrupted by the petitioner on both occasions after the petitioner had already indicated that the sentence was "totally outrageous." Persisting after the second interruption of the court, the petitioner told the court that "there is no basis for the sentence just imposed," at which time the court warned him: "You're out of order." Rather than taking heed, the petitioner immediately responded, *"I know I am,* but there is no basis for that sentence."[12] (Emphasis added.) After acknowledging this, the trial court said: "[The petitioner] is held in contempt . . . ." Then the court again directed that the clerk notify the defendant Walker of his rights to appeal on the record.

This conduct was a criminal contempt, directed as it was against the dignity and authority of the court. Practice Book § 985. " 'From necessity the court must be its own judge of contempts committed within its presence.' *Goodhart* v. *State,* supra [62–63]." *McClain* v. *Robinson,* 189 Conn. 663, 669, 457 A.2d 1072 (1983). In *In re Little,* supra, 555–56, the court drew a distinction between the manner of the use of words by the alleged contemnors and doing so in a loud and boisterous manner as well as considering the effect of the conduct upon court proceedings. In reversing the state court judgment of contempt, the *In re Little* court said: " 'It is not charged that [the alleged contemnors] disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties. . . .' " Id., 556. From what we have already

habeas corpus, to advise the defendant in writing of such rights as he may have to an appeal, of the time limitations involved, and of the right of an indigent person who is unable to pay the cost of an appeal to apply for a waiver of fees, costs, and expenses and for the appointment of counsel to prosecute the appeal."

[12] There is no claim by the petitioner on appeal that the sentence imposed was in excess of permissible statutory limits.

noted, what occurred on November 10, 1988, is factually very different from *In re Little.* With reference to any "reason" for the petitioner's conduct, we note that the record is absolutely barren of any "running, bitter controversy" between the trial judge and the petitioner even though the petitioner had only recently been through a murder trial before the same judge. See *Naunchek* v. *Naunchek,* 191 Conn. 110, 118–19, 463 A.2d 603 (1983); but cf. *Taylor* v. *Hayes,* 418 U.S. 488, 501, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974); *Mayberry* v. *Pennsylvania,* 400 U.S. 455, 465, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971). The petitioner's statements and his conduct, insofar as the record discloses, were "directed against the dignity and authority of the court" as an institution and not against the trial judge personally. Conduct which is directed against the dignity and authority of the court must be accompanied by the intent on the part of the alleged contemnor to do that. See, e.g., *Matter of Pilsbury,* 866 F.2d 22, 27 (2d Cir. 1989); *United States* v. *Seale,* 461 F.2d 345, 367–68 (7th Cir. 1972). While the United States Supreme Court in *In re McConnell,* supra, properly recognized the wide latitude to be permitted defense counsel in vigorously defending a client, *"McConnell* cannot be read as an immunization for all conduct undertaken by an attorney in good faith representation of his client . . . ." *In re Dellinger,* 461 F.2d 389, 398 (7th Cir. 1972), aff'd, 502 F.2d 813 (7th Cir. 1974), cert. denied, 420 U.S. 990, 95 S. Ct. 1245, 43 L. Ed. 2d 671 (1975). Conduct, when allegedly contumacious, cannot be justified merely by asserting that it was undertaken in good faith. *State* v. *Campbell,* 497 A.2d 467, 473 (Me. 1985), cert. denied, 474 U.S. 1032, 106 S. Ct. 594, 88 L. Ed. 2d 5741 (1985). Under the circumstances of this case, the petitioner "should reasonably have been aware that his conduct was wrongful." Id. He actually stated that he *knew* that he was "out of

order" when the trial judge so cautioned him. There was thus nothing, insofar as the petitioner was concerned, that was unclear or indefinite about the trial court's caution. See *Commonwealth* v. *Garrison,* supra, 368–69.

To be held in criminal contempt, a contemnor must have the requisite intent; the conduct must be willful. *Matter of Pilsbury,* supra; *United States* v. *Thoreen,* 653 F.2d 1332, 1342 (9th Cir. 1981); *Sykes* v. *United States,* 444 F.2d 928, 930 (D.C. Cir. 1971); Black's Law Dictionary (5th Ed.). Intent may be inferred from facts and circumstances. *United States* v. *Thoreen,* supra. Generally, willfulness may be inferred from a reckless disregard for a court's order. *United States* v. *Delahanty,* 488 F.2d 396 (6th Cir. 1973); *Sykes* v. *United States,* supra; *Murphy* v. *State,* 46 Md. App. 138, 416 A.2d 748 (1980). Stated another way, "[t]he minimum requisite intent [for criminal contempt] is better defined as a volitional act by one who knows or should reasonably be aware that his conduct is wrongful." *United States* v. *Seale,* supra, 368. The requisite intent in this case may properly be inferred from the record of what occurred on November 10, 1988. An attorney need not be accorded one contemptuous remark before a judge may consider a summary contempt adjudication. *Commonwealth* v. *Stevenson,* 482 Pa. 76, 90, 393 A.2d 386 (1978). The danger of the allegedly contumacious conduct of offending the authority and dignity of the court " 'must not be remote or even probable, it must immediately imperil [it] . . . . ' " *In re Little,* supra, 555; accord *In re McConnell,* supra (contempt reversed where attorney failed to carry out threat to disobey court order); *United States* v. *Seale,* supra, 370. It is evident that the authority of the court in this case was significantly hindered by the petitioner's conduct. Despite the court's order to the clerk to notify the defendant Walker of his right to appeal, the petitioner's

conduct obstructed the execution of that valid order. This was not a mere affront to the sensibilities of the trial judge qua trial judge; it directly hindered and interfered with the Superior Court qua Superior Court in its orderly processing of business before it. This misconduct[13] led to obstruction and delay and was directed against the dignity of the court. The petitioner was guilty of criminal contempt in violation of Practice Book § 985 and the trial court had the summary contempt power to deal with such contumacious conduct that took place in open court and in its immediate presence and view. See *Naunchek* v. *Naunchek,* supra, 113.

## II

It is appropriate here to advert to the judgment of contempt which this writ of error brings to this court. In his second claim of error, the petitioner maintains that he was held in contempt on November 10, 1988, without any opportunity to address the court prior to the adjudication of guilt. The state argues, to the contrary, that the trial court's statement that "[the petitioner] is held in contempt of this court" on November 10, 1988, was not a final adjudication of guilt because, otherwise, it would have been pointless to have afforded him an opportunity to obtain counsel and there would not have been any need to "continue and finish" the proceedings as the court was prepared to do on November 10, 1988. The state claims, accordingly, that the final adjudication of guilt did not take place until the conclusion of the hearing on November 15, 1988. It contends that the petitioner incorrectly claims that he was not given the opportunity because the court's statement on November 10, 1988, i.e., "[h]e is

---

[13] One court has noted the difficulty of defining "misconduct" in the context of contempt and defined it "as conduct inappropriate to the particular role of the actor, be he judge, juror, party, witness, counsel or spectator." *United States* v. *Seale,* 461 F.2d 345, 366 (7th Cir. 1972).

held in contempt" did not constitute a final adjudication of guilt. The state maintains rather that the final adjudication of guilt did not occur until November 15, 1988, at which time the petitioner was represented by counsel who addressed the court and the petitioner himself spoke on his own behalf.[14]

Although the court, in its articulation, said that "[the petitioner] was held in contempt [on November 10, 1988]," a writ of error lies only from a final judgment and for errors of law apparent on the face of the record. *Geddes* v. *Sibley,* 116 Conn. 22, 24, 163 A. 596 (1932). Even though the petitioner was held in contempt on November 10, 1988, it is evident, and the petitioner does not contend otherwise, that there was no final judgment on that date from which a writ of error would lie. This is so because no sanction or punishment had yet been imposed and, therefore, there had been no final judgment disposing of the matter. *State* v. *Curcio,* 191 Conn. 27, 31, 463 A.2d 566 (1983); see *Barbato* v. *J. & M. Corporation,* 194 Conn. 245, 247–48, 478 A.2d 1020 (1984). No final judgment existed in this contempt proceeding until the court decided on November 15, 1988, not to change its earlier ruling but proceeded to final adjudication and imposed the sanction of the $100 fine. This, we submit, has significance on the remaining issues to be decided, particularly the petitioner's claim that the continuance to November 15, 1988, which *he* requested, all but attenuated the nature of the proceeding against him as one in summary criminal contempt and required, inter alia, the recusal of the trial judge.

---

[14] We note that during the hearing of November 15, 1988, counsel for the petitioner said, inter alia, to the court: "I have read the transcript of what occurred Thursday. I was not, of course, there. I asked the court before, and I will ask again, to consider changing its ruling." It is fair to say that at the hearing of November 15, 1988, which was the date to which the matter had been continued at the request of petitioner's counsel, the latter asked the court to open and change its ruling of November 10, 1988.

## III

The petitioner next claims that the proceedings that culminated in the finding of summary criminal contempt were conducted in violation of his due process rights as set forth in § 988 of the Practice Book and as afforded by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[15] In making this claim, he maintains that the matter was "improperly adjudicated" before the same judge before whom the alleged contemptuous conduct occurred. The state, on the other hand, contends that the petitioner's adjudication of summary criminal contempt comported with the requirements of due process as provided in the United States and Connecticut constitutions and the Practice Book. In oral argument before this court, the state, while conceding that the "literal terms" of the Practice Book had not been complied with, argued that the substance of the due process prescribed by the Practice Book had been fully extended to the petitioner.

The United States Supreme Court "has often recognized that the requirements of due process cannot be ascertained through mechanistic application of a formula." *Groppi* v. *Leslie,* 404 U.S. 496, 500, 92 S. Ct. 582, 30 L. Ed. 2d 632 (1972). The essence of due process is fundamental fairness. *United States ex rel. Crist* v. *Lane,* 745 F.2d 476, 482 (7th Cir. 1984), cert. denied, 471 U.S. 1068, 105 S. Ct. 2146, 85 L. Ed. 2d 503 (1985).

---

[15] We need not discuss the petitioner's assertion concerning article first, § 8, of the Connecticut constitution. He provides no separate analysis under the Connecticut constitution of that matter as pertains to this claim. In any event, we note that we have said that the due process provisions of the United States and Connecticut constitutions generally have the same meaning and impose similar constitutional limitations. See *Keogh* v. *Bridgeport,* 187 Conn. 53, 59–60, 444 A.2d 225 (1982); *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982).

Due process is an element that, when absent, produces the reaction given to that which is "shocking to the universal sense of justice." *United States* v. *Russell,* 411 U.S. 423, 432, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. *Williams* v. *Bartlett,* 189 Conn. 471, 476, 457 A.2d 290, appeal dismissed, 464 U.S. 801, 104 S. Ct. 46, 78 L. Ed. 2d 67 (1983); *Lee* v. *Board of Education,* 181 Conn. 69, 73, 434 A.2d 333 (1980).

The petitioner contends that he was denied the due process provided for by Practice Book § 988. The state disagrees, claiming that he was accorded the required due process although it does concede that § 988 was not followed literally. The lack of a "mechanistic application"; see *Groppi* v. *Leslie,* supra; of Practice Book § 988 should not serve to defeat its due process requirements if they were substantively met. "The design of the rules of practice is both to facilitate business and to advance justice; 'they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice.' " *Snow* v. *Calise,* 174 Conn. 567, 574, 392 A.2d 440 (1978). Rules of practice must be construed reasonably and with consideration of this purpose. *Densmore* v. *Eyles,* 32 Conn. Sup. 519, 521, 342 A.2d 62 (1975); 20 Am. Jur. 2d, Courts § 86. Rules "are a means to justice, and not an end in themselves; their purpose is to provide for a just determination of every proceeding." *State* v. *Emmett,* 108 N.J. Super. 322, 325, 261 A.2d 374 (1970).

The petitioner was not denied due process despite the trial court's failure to comply literally with Practice Book § 988. His being held in contempt on November 10, 1988, cannot be said to have come as any

surprise to him at that time, because his conduct as an officer of the court was such that he acknowledged that he knew, as he should have, that he was "out of order." Moreover, there was nothing unclear or indefinite about that caution given by the court. Undaunted, however, he compounded the earlier "totally outrageous" tenor of his view of the sentence by saying thereafter "but there is no basis for that sentence." The trial court then said that "[the petitioner] is held in contempt of this court." The petitioner clearly understood the trial judge's perception of his conduct. See *Pennsylvania* v. *Local Union 542, International Union of Operating Engineers,* 552 F.2d 498, 512 n.20A (3d Cir.), cert. denied, 434 U.S. 822, 98 S. Ct. 67, 54 L. Ed. 2d 79 (1977). This scenario, in justice, cannot be said to avoid the contempt merely because it did not include on November 10, 1988, "a recital of those facts in which the adjudication of guilt is based" as set out in § 988. Significantly, on November 10, 1988, as well as on November 15, 1988, neither the petitioner nor his counsel ever claimed that he did not understand the factual scenario upon which the trial court "held" him in contempt on November 10, 1988. This is so especially when his counsel discussed the matter with the trial court in chambers on November 10, 1988, at which time his counsel was shown the court proceedings of that date. Further, with reference to a "recital" of the facts under § 988, it must not be overlooked that on November 10, 1988, as well as on November 15, 1988, neither the petitioner nor his counsel, who are both attorneys at law, ever claimed that there was a constitutional deprivation of notice of the factual scenario upon which the court "held" the petitioner in contempt on November 10, 1988, or for that matter, any violation of a statute or rule of practice.

As to that portion of Practice Book § 988 that provides, "[p]rior to the adjudication of guilt, the judicial

authority shall . . . inquire as to whether [the petitioner] has any cause to show why he should not be adjudged guilty of contempt by presenting evidence of excusing or mitigating circumstances," there was no violation of the substance of this portion of the rule. Any claim that this portion was not literally complied with overlooks the fact that the petitioner availed himself of the opportunity on November 10, 1988, to obtain counsel who forthwith came to court, spoke to the trial judge and was shown a copy of the transcript at that time. The trial court "was prepared to continue and finish the summary contempt proceedings at that time." We are entitled to presume that the trial court would have done so by according the petitioner the due process prescribed by Practice Book § 988. See *State* v. *Crumpton,* 202 Conn. 224, 231, 520 A.2d 226 (1987); *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 6, 513 A.2d 1218 (1986). We have had occasion to say: " 'Where a contempt occurs in the presence of the court, no witnesses are required in proof of the contempt, and the court has inherent power to impose punishment on its own knowledge and of its own motion without formal presentation or hearing of the person adjudged in contempt. *State* v. *Jackson,* 147 Conn. 167, 169, 158 A.2d 166 [1960]; *McCarthy* v. *Hugo,* 82 Conn. 262, 266, 73 A. 778 [1909]. . . .' *Whiteside* v. *State,* [148 Conn. 77, 78, 167 A.2d 450 (1961)]." *Moore* v. *State,* 186 Conn. 256, 259, 440 A.2d 969 (1982). As already noted, petitioner's counsel, however, requested and was granted a continuance until the next court day, at which hearing the petitioner and his counsel were fully heard before sentence was imposed. Once again, there was no claim raised below that this portion of Practice Book § 988 was violated.

In addition, Practice Book § 988 permits a criminal contempt to be punished "summarily if the conduct constituting the contempt was committed in the actual

presence of the court . . . and such punishment is necessary to maintain order in the courtroom." Although punishment, in this case, was not imposed "summarily,"[16] in a technically temporal sense, it was imposed on the next court day to which it had been continued at the request of petitioner's counsel. Of course, "[d]ue process cannot be measured in minutes and hours or dollars and cents." *Taylor* v. *Hayes, supra,* 500. Judgment forthwith is not required by the text of Practice Book § 988. Moreover, if the conduct of an attorney warranted immediate summary punishment, no possible prejudice to him could result from some delay if it were appropriate. The delay in imposing punishment here was appropriate, especially when it came about by the petitioner's request.

That the matter was not fully disposed of until November 15, 1988, cannot convert the contempt proceeding started on November 10, 1988, into one requiring a hearing before another judge. See *Matter of DeMarco,* 224 N.J. Super. 105, 118, 539 A.2d 1230 (1988). Some courts have indicated that it is often useful to postpone disposition of a contempt charge against an attorney for a time after the alleged contumacious conduct. *Sacher* v. *United States, supra,* 8–10; see *Taylor* v. *Hayes, supra,* 498–500; *Pennsylvania* v. *Local Union 542, International Union of Operating Engineers, supra,* 512–14 (trial judge's twenty-four hour delay did not bar summary contempt proceeding);

---

[16] "Summary" in this context has been said not to refer to the timing of the action with reference to the offense but refers rather to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, to bring evidence, awaiting briefs and the like. *Sacher* v. *United States,* 343 U.S. 1, 9, 72 S. Ct. 451, 96 L. Ed. 2d 717 (1952). The term refers to the character of the proceedings, not its timing; it does not demand instant punishment. *People* v. *Fusaro,* 18 Cal. App. 3d 877, 889, 96 Cal. Rptr. 368 (1971), cert. denied, 407 U.S. 912, 92 S. Ct. 2445, 32 L. Ed. 2d 686 (1972).

*United States* v. *Schiffer,* 351 F.2d 91, 93–94 (9th Cir. 1965), cert. denied, 384 U.S. 1003, 86 S. Ct. 1914, 16 L. Ed. 2d 1017, reh. denied, 385 U.S. 890, 87 S. Ct. 12, 17 L. Ed. 2d 121 (1966); *In re Osborne,* 344 F.2d 611, 616 (9th Cir. 1965). One court has noted that when the misconduct is not likely to be repeated, withholding immediate action "has much in its favor. . . . A deliberate course encourages a more dispassionate evaluation of the incident." *In re Contempt of Ungar,* 160 N.J. Super. 322, 333, 389 A.2d 995 (1978); see *State* v. *Zoppi,* 72 N.J. Super. 432, 436–37, 178 A.2d 632 (1962). In this case, the matter was finally disposed of on the next court day following the incident. The trial judge was prepared to continue and finish the summary proceedings on the day the contempt occurred. He, however, decided to continue the matter at the request of petitioner's counsel.[17] It would be anomalous to conclude that, having postponed a final disposition at the petitioner's request, the trial court's power to uphold the authority and dignity of the court in this summary criminal contempt proceeding thereby became so attenuated and enfeebled as to render it constitutionally impermissible for the proceedings to be completed by this trial judge on the next court day.

Further, the petitioner advances another basis for arguing that a different judge should have conducted the hearing on November 15, 1988. The petitioner now claims, although he never did in the trial court, that his "remarks" were directed at the trial judge, specifically the sentence imposed. He argues that his

---

[17] There is no transcript of the circumstances of the granting of this continuance on November 10, 1988. We do, however, know that after the court recessed, following the contumacious conduct, an attorney representing the petitioner came to the trial judge's chambers. What transpired at that time is not in the transcript. The same attorney also represented the petitioner at the subsequent hearing on November 15, 1988. He, however, did not argue the writ of error before this court.

"statement" and the trial judge's "reaction," i.e., immediately holding him in contempt, were, without question, "causally linked." The petitioner says that "[w]hile it is not at all apparent that [his] remarks constituted a 'personal attack' upon the trial judge, the circumstances reveal at minimum a disagreement between the Court and [the petitioner] to cause 'embroilment' of the judge." The nature of the circumstances on the record, the petitioner contends, "reasonably suggests that marked personal feelings were potentially present on both sides." He maintains that it is apparent from the record that there was sufficient reason and opportunity to convene a hearing before a different judge. We note that, despite his present claim, there is nothing on the record to suggest that he or his counsel ever raised the matter of the recusal of the trial judge in the trial court.[18]

The concern of due process is the fair administration of justice. *Mayberry* v. *Pennsylvania,* supra, 465. There are times when a judge, instead of representing " 'the impersonal authority of [the] law,' " has permitted himself to "become so 'personally embroiled' with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge." Id.; *Offutt* v. *United States,* 348 U.S. 11, 17, 75 S. Ct. 11, 99 L. Ed. 11 (1954) (in *Offutt,* there was "an intermittently continuous wrangle on an unedifying level" between the trial judge and the attorney over the fourteen days of the trial). This case is not *Offutt,* as the trial judge in this case was "not an activist seeking combat [as in *Offutt*]," nor is there any claim of any difficulty between the trial judge and the petitioner during the underlying murder trial. *Mayberry* v. *Pennsylvania,* supra. This trial judge did not find himself in the position of the trial judge in *Mayberry,* where during the course of a

---

[18] The transcript of the hearing of November 15, 1988, is reproduced in the state's brief.

twenty-one day criminal trial, the defendant repeatedly insulted and slandered the trial judge calling him, inter alia, a "dirty son of a bitch," "a dirty tyrannical old dog," a "stumbling dog," a "fool," telling him to "go to hell," "You need to have some kind of psychiatric treatment. You're some kind of nut," "I ask Your Honor to keep your mouth shut while I'm questioning my own witness" and "you ought to be Gilbert and Sullivan the way you sustain the district attorney every time he objects to the questions." Id., 457–62. In vacating the contempt convictions[19] and remanding for a trial before a different judge, the United States Supreme Court said that a judge, "vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running bitter controversy" and "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." Id., 465; see *Naunchek* v. *Naunchek,* supra, 117.

In circumstances where the final adjudication of criminal contempt and the sentencing are postponed until after the underlying trial, the later case of *Taylor* v. *Hayes,* supra, is instructive on the fundamental due process requirements of the fourteenth amendment in state court criminal contempt proceedings. Factually, *Taylor* is significantly distinguishable from this case.[20] In *Taylor,* where final conviction and punish-

---

[19] The trial judge in *Mayberry* v. *Pennsylvania,* 400 U.S. 455, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971), found that Mayberry had committed one or more contempts on eleven of the twenty-one days of trial and sentenced him to not less than one and not more than two years for each of the eleven contempts or a total of eleven to twenty-two years.

[20] In *Taylor* v. *Hayes,* 418 U.S. 488, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974), the petitioner Taylor represented the accused in a Kentucky murder trial. During that "turbulent" trial, the respondent Judge Hayes informed the petitioner on nine different occasions that he was in contempt of court. Id., 490. No sentence was imposed during the trial on any charge and petitioner was permitted to respond to most, but not all, of the charges. At the conclusion of the trial and in the presence of the jury that had returned a guilty verdict, the trial judge made a statement concerning the

ment were delayed and the petitioner was denied the opportunity, although he requested it, to respond to the trial judge, the court concluded that the petitioner "was entitled to more of a hearing and notice than he received prior to final conviction and sentence." Where conviction and punishment are delayed, *Taylor* noted that " 'it is much more difficult to argue that action without notice or hearing of any kind is necessary to preserve order and enable [the court] to proceed with its business.' " Id., 498. *Taylor* then appropriately turned to *Groppi's* allusion to the circumstance that the contemnors in *Sacher* were " 'given an opportunity to speak' " and the " 'trial judge [in *Sacher*] would, no doubt[,] have modified his action had their statements proved persuasive.' " Id.; see *Groppi* v. *Leslie,* supra, 506 n.11. Drawing further on *Groppi, Taylor* stated that "*Groppi* counsels that before an attorney is finally adjudicated in contempt and sentenced after trial for conduct during trial, he should have reasonable notice of the specific charges and opportunity to be heard on his own behalf" that could include, it said, inquiry that the "behavior at issue was not contempt but acceptable conduct of an attorney representing his client; or, he might present matters in mitigation or otherwise attempt to make amends with the court." *Taylor* v. *Hayes,* supra, 498, 499.

We recognize that there are cases where "contemptuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in con-

petitioner's trial conduct. He also refused the petitioner's request to respond and imposed consecutive sentences on nine counts of contempt aggregating almost four and one-half years' imprisonment, including sentences of one year's imprisonment on each of two counts. Later, the respondent amended the judgment to eliminate the first contempt charge but was silent on whether all of the sentences were to run concurrently or consecutively. A few days after the original sentence, the respondent also barred the petitioner from practicing law in the respondent's division of the criminal branch of court.

troversy that he cannot 'hold the balance nice, clear and true between the State and the accused . . . .' *Tumey* v. *Ohio,* 273 U.S. 510, 532 [47 S. Ct. 437, 71 L. Ed. 749] (1927)." Id., 501. The inquiry in making this ultimate judgment "must be not only whether there was actual bias on [the trial judge's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' *Ungar* v. *Sarafite,* 376 U.S. 575, 588 [84 S. Ct. 841, 11 L. Ed. 2d 921] (1964)." Id. The conduct of both the trial judge and the alleged contemnor are to be considered in the calculus of the ultimate determination of whether the trial judge is disqualified.

With these considerations in mind, we examine the record. It does not appear that the trial judge ever became embroiled in a "running controversy" with the petitioner. Moreover, the petitioner's conduct was not a "personal attack" on the trial judge as his brief all but explicitly concedes. In any event, even though short of a "personal attack," the trial judge's reaction to the petitioner's conduct cannot fairly be said to have been such that the trial judge could not " 'hold the balance nice, clear and true between the State and the [petitioner] . . . .' " *Taylor* v. *Hayes,* supra, 501. The record does not disclose, as it did in *Taylor,* "a mounting display of an unfavorable personal attitude . . . and his motives, sufficiently so that the contempt issue should have been finally adjudicated by another judge." Id., 501–502. Significantly, the petitioner does not refer to any instance on November 10, 1988, where the court became personally embroiled with the petitioner. See *United States* v. *Renfroe,* 634 F. Sup. 1536 (W.D. Pa.), aff'd, 806 F.2d 254 (3d Cir. 1986). Unlike the petitioner in *Taylor,* but like the petitioner in *Ungar* v. *Sarafite,* supra, the contempt of the petitioner in this case did

not proceed summarily to its conclusion in the temporal context, but he was given notice and afforded an opportunity for a hearing that was conducted in a judicial setting with proper decorum.

The transcript of the hearing of November 15, 1988,[21] also discloses that petitioner's counsel had earlier asked

[21] The transcript of the hearing of November 15, 1988, discloses the following:

"The Court: You wish to be heard?

"Mr. Klein: Yes, I do, your Honor.

"[I am] Gerald Klein and I represent Mr. Dodson as the court knows for purposes of this proceeding.

"Your Honor, since Thursday I had an opportunity to really educate myself on some of the statutes and cases that apply to contempt, which occurs before the court. I had briefly noted in chambers State versus Andrew Maliszewski 36 Conn. Supplement 547, which includes a very thorough discussion between civil and criminal contempt, and also between summary and non-summary contempt.

"I have read the transcript of what occured Thursday. I was not, of course, there. I asked the court before, and I will ask again, to consider changing its ruling. It appears that Mr. Dodson was not expecting the legal justified sentence that the court imposed and reacted in an emotional way as attorneys from time to time do. I apologize to the court on his behalf as he apologized to the court.

"I would like to ask the court to reconsider that, and if the court feels that some sanction is in order, I would again draw the court's attention to [§] 51-84 of the General Statutes, which subjects officers of this court, attorneys-at-law to certain rules and the court can fine any lawyer up to one hundred dollars or suspend or disbar that lawyer for an infraction of those rules, which is truly a civil matter. Any action under [General Statutes §§] 51-33 or 51-33a would, of course, be in the nature of a criminal conviction. I would respectfully suggest to the court that that might be too harsh a penalty upon this young attorney, who has been a member of the bar five or six years and in my opinion has a good reputation and obviously one only has to glance at the transcript to see that he spoke out of line. These things happen from time to time and I haven't seen him in that type of a situation before, the many times I have seen him appear before many judges.

"Again, your Honor, [§] 51-33 the so-called summary criminal contempt indicates that the court may punish by fine or imprisonment anyone who behaves contemptuously or in a disorderly manner up to one hundred dollars or six months in jail or both.

"The Practice Book section in dealing with this particular statute, Section 988 summary criminal contempt. Such punishment as appears before the court can take place if necessary to maintain order in the courtroom. A judgment of guilt of contempt shall include recital of those facts on which

the trial judge to "consider changing his ruling" of November 10, 1988, and that he also asked the trial

the adjudication is based. Prior to the adjudication of guilt the judicial authority shall inform the defendant of the accusations against him and inquire as to whether he has any cause to show why he should not be adjudged guilty of contempt by presenting evidence of excusing or mitigating circumstances.

"Now, it is my understanding that [§] 51-33a non-summary criminal contempt requires a warrant and filing of an information and obviously from my perspective in representing this man we don't want that to occur.

"I don't know if the state is interested in that type of prosecution. I doubt it, but if the court is going to proceed under [§] 51-33 by way of mitigation, I think I have stated or I will put on the record what I told the court on Thursday in chambers.

"I had occasion to have a discussion with Mike Dodson earlier in the day about this case, which very coincidentally I know a lot about and as the State's Attorney knows, I represented Mr. Solomon, one of the victims. I previously represented Tracey Fisher and I just knew the cast of characters here. Now, [a] very minor personal problem was bothering him earlier in the day [that] may have contributed to his outburst in the courtroom.

"Again, I read the transcript and I understand from speaking to other people who were here, that the way he expressed himself was worse than what you see in black and white, but I would ask the court to consider the various options apparently that the court would have here to fashion a sanction, if there is one, into a non-criminal situation which really if the court will not accept his belated apology or second apology, a more thorough apology to discipline him under [§] 51-84 which calls for just a fine up to one hundred dollars.

"That is all I have to say.

"The Court: You have anything to say?

"Mr. Dodson: Yes, your Honor please. I have a brief statement.

"May it please the court, what I said in court last Thursday was a spontaneous and emotional response to what I perceived as a gross injustice done to my client. No disrespect of the court was intended and if my remarks were interpreted as disrespect, I sincerely apologize to the court. On the other hand, to me silence in the face of injustice is acquiescence with it. To have said nothing would have been the easier and safer thing to do, but not something I could have done. As a zealous advocate of my client's interests, and as a human being, I had to let the court know what I perceived as an extreme miscarriage of justice. To that extent I have no regrets and I would do it again.

"Again, no disrespect shown to the court and I apologize.

"The Court: The statement contains portions that can be characterized as nothing less than unmitigated gall. Your statement concerning silence being acquiescence apparently is a lack of recognition on your part that

court to consider doing so at the November 15, 1988 hearing. Petitioner's counsel spoke first and gave his argument for reconsideration, including the claim that the petitioner had reacted "in an emotional way" to the sentence imposed on Walker, which petitioner's counsel referred to as "legal[ly] justified." Counsel also apologized to the court on the petitioner's behalf. He referred to certain statutes[22] on contempt and read from Practice Book § 988 and asked that if the court were not going to accept his apology, then the petitioner be disciplined under General Statutes § 51-84, "which calls for just a fine up to one hundred dollars." That the petitioner did not know "the nature of [the] sanction" and that he asked for "clarification" at the hearing lacks merit. He had actual knowledge of the specific accusation.

The petitioner was permitted to address the trial court at the hearing to urge that his behavior was "the acceptable conduct of an attorney representing his client," to "present matters in mitigation"[23] or "otherwise attempt to make amends with the court." *Taylor* v. *Hayes*, supra, 499. The petitioner was thus given this hearing with the attendant right of allocution. See id., 500; *Groppi* v. *Leslie*, supra, 504; *Weiss* v. *Burr*, 484 F.2d 973, 987 (9th Cir. 1973), cert. denied, 414 U.S. 1161, 94 S. Ct. 924, 39 L. Ed. 2d 115 (1974). Under

the process provides an appellate review, which is available to your client. Clients are not to be served by outrageous outbursts of their lawyers during a session in Superior Court.

"The court will impose a fine of one hundred dollars. These proceedings shall be certified to the Judges of the Superior Court, State Bar Grievance Association and the Hartford County Bar for their permanent records."

[22] Petitioner's counsel referred to General Statutes §§ 51-33, 51-33a and 51-84.

[23] During his presentation, petitioner's counsel stated that he had spoken to the petitioner on November 10, 1988, at a time before the conduct involved in this appeal, and said that a "very minor personal problem was bothering [the petitioner] earlier in the day [that] may have contributed to his outburst in the courtroom." The petitioner never referred to any such "problem" when he addressed the court on November 15, 1988.

due process concepts, it is appropriate not only to allow the alleged contemnor to be represented by counsel, but also to allow him "to retreat [if he so chooses] from his conduct, and to have the opportunity to correct misunderstandings on the part of the [trial] judge." *Matter of DeMarco,* 224 N.J. Super. 105, 120–21, 539 A.2d 1230 (1988); *In re Kozlov,* 156 N.J. Super. 316, 326, 383 A.2d 1158 (1978), rev'd on other grounds, 79 N.J. 232, 398 A.2d 882 (1979). In his remarks on November 15, 1988, the petitioner described his conduct of November 10, 1988, as "a spontaneous and emotional response to what [he] perceived as a gross injustice done to [his] client," that "[n]o disrespect of the court was intended" and "if [his] remarks were interpreted as disrespect, [he] sincerely apologize[d] to the court." He immediately continued, however, and said: "On the other hand, to me silence in the fact of injustice is acquiescence with it. To have said nothing would have been the easier and safer thing to do, but not something I could have done. As a zealous advocate of my client's interests, and as a human being, I had to let the court know what I perceived as an extreme miscarriage of justice. *To that extent I have no regrets and I would do it again.* Again, no disrespect shown to the court and I apologize." (Emphasis added.) After hearing both the petitioner and his counsel, it is apparent that the trial court did not find their arguments "persuasive"; see *Taylor* v. *Hayes,* supra, 498; so as to cause it to change its ruling. The trial court then imposed the punishment of a fine.

We recognize that the "sole credible basis for the summary contempt process is necessity, a need that the assigned role of the judiciary be not frustrated." *In re Fair Lawn Education Assn.,* 63 N.J. 112, 114–15, 305 A.2d 72, cert. denied, 414 U.S. 855, 94 S. Ct. 155, 38 L. Ed. 2d 104 (1973). Although this judicial "power is as ancient as the courts to which it is attached and

'as ancient as any other part of the common law' ''; *In re Caruba,* 139 N.J. Eq. 404, 427, 51 A.2d 446, aff'd, 140 N.J. Eq. 563, 55 A.2d 289 (1947), cert. denied, 335 U.S. 846, 69 S. Ct. 69, 93 L. Ed. 396 (1948), quoting *Rex* v. *Almon,* 97 Eng. Rep. 94, 99 (K.B. 1765); it should be exercised sparingly and in accordance with the requirements of due process. Summary criminal contempt should not be employed as a means of abuse but courts have the right in appropriate circumstances to employ it to vindicate their dignity and authority upon any interference and to go no further. See R. Goldfarb, The Contempt Power (1963) p. 182. It follows from what we have said that this was an appropriate case for its exercise and that that exercise comported with the applicable law.

There is no error.

In this opinion PETERS, C. J., CALLAHAN, GLASS, COVELLO and HULL, Js., concurred.

SHEA, J., dissenting. I agree with the majority that there is a sufficient basis in the record to support the trial court's finding of contempt. I disagree, however, with its conclusion that "there was no violation of the substance" of the following provision of Practice Book § 988 prescribing the procedure for a summary criminal contempt proceeding: "Prior to the adjudication of guilt the judicial authority shall inform the defendant of the accusation against him and inquire as to whether he has any cause to show why he should not be adjudged guilty of contempt by presenting evidence of excusing or mitigating circumstances."

The state concedes that this provision, which incorporates the basic constitutional requirements of notice and hearing contained in our federal and state constitutions, "was not followed literally." Indeed, the record demonstrates that the trial court found the

petitioner in contempt without any prior notice or opportunity to be heard before that finding was made on November 10, 1988.

The majority attempts to justify this oversight of the trial court by relying upon the proceedings of November 15, 1988, when the petitioner was given an opportunity to try to persuade the judge to reverse the finding of contempt that he had previously made. The majority does not explain how this proceeding can be deemed to cure the deficiency in the earlier proceeding when the contempt finding was made. Anyone familiar with human nature must recognize the herculean task imposed upon a litigant seeking reversal from the same trier of a finding of fact that has been publicly announced. Such a belated opportunity to be heard is not the equivalent of the notice and hearing prior to any adjudication of guilt that § 988 prescribes.

The evident purpose of the rule is to bar any adjudication of summary criminal contempt without prior notice that the offending person may be held in contempt and without allowing him to present "excusing or mitigating circumstances." Since we have the rule, the trial judge should have followed it or, as an alternative, should have referred the matter for prosecution under Practice Book §§ 991 and 992[1] as a nonsummary criminal contempt before another judge.

Accordingly, I dissent.

---

[1] "[Practice Book] Sec. 991. —— ——NATURE OF PROCEEDINGS

"A criminal contempt not adjudicated under Sec. 987 shall be prosecuted by means of an information. The judicial authority may, either upon his own order or upon the request of the prosecuting authority, issue an arrest warrant for the accused. The case shall proceed as any other criminal prosecution under these rules and the General Statutes."

"[Practice Book] Sec. 992. —— ——DISQUALIFICATION OF JUDICIAL AUTHORITY

"The trial and all related proceedings on which the contempt charges are based shall be heard by a judicial authority other than the trial judge or the judicial authority who had issued the order which was later disobeyed."